## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**FREDERICK HALL, *et al.*,**

      **Plaintiffs,**

                   **Case No. 1:20-cv-918**
      **v.**                      **JUDGE DOUGLAS R. COLE**

**JOHN D. CULLINAN, *et al.*,**

      **Defendants.**

## **OPINION AND ORDER**

"Build a better mousetrap, and the world will beat a path to your door," or so the old saying goes. Plaintiff Alien Technologies Corp. and Norge Holdings LLC (collectively Alien Technologies)[1] claim that they did just that by designing a movable contraption with a single support bar that enables one person to lift a removeable hardtop off a Jeep. In this action, they allege that Defendants John D. Cullinan and Lynx Precision Products Corporation (collectively Lynx) are wrongly selling their "better mousetrap." Specifically, Alien Technologies contends that Lynx is currently infringing Alien Technologies' U.S. Patent No. 9,643,823 (the '823 Patent) and has misappropriated its trade secrets in violation of a confidentiality agreement between the parties. (Doc. 66-1, #1638, 1653–54).

---

[1] The original Complaint listed Frederick Hall and Alien Technologies Corp. as plaintiffs. Plaintiffs Hall and Alien Technologies later moved, however, to substitute Norge Holdings LLC for Hall as a plaintiff. (Doc. 39). The Court (the matter was then assigned to another Judge) granted that motion (Doc. 45), and Plaintiffs, now Alien Technologies and Norge, filed an Amended Complaint sans Hall (Doc. 46).

Currently before the Court is Alien Technologies' motion for preliminary injunction and temporary restraining order. (Doc. 66). This motion requests that, for the pendency of this action, the Court enjoin Defendants John D. Cullinan and Lynx Precision Products Corporation from advertising, manufacturing, selling, or distributing its "RollnJack" product, the product that Alien Technologies claims incorporates its protected design.

As further explained below, the Court finds that Alien Technologies has satisfied the requirements for a preliminary injunction based on its trade secrets claim. And, although Federal Rule of Civil Procedure 65(c) usually requires a bond to secure the entry of a preliminary injunction, the Court finds that Defendants have expressly waived the right to any such bond in the confidentiality agreement they signed with Plaintiffs. Therefore, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 66). Specifically, the Court **PRELIMINARILY ENJOINS** Defendants from directly or indirectly advertising, manufacturing, selling, or distributing its RollnJack product within the United States. Moreover, the Court does so without requiring Plaintiffs to post a bond. But the Court **DENIES AS MOOT** Plaintiffs' request for a temporary restraining order.

## BACKGROUND

Frederick Hall, who was originally a party to this lawsuit, is the named inventor on the '823 Patent and serves as the President of Alien Technologies. Norge Holdings owns the '823 Patent and Alien Technologies is the patent's exclusive

licensee. The '823 Patent generally discloses a device that enables a single person to remove and replace the convertible hardtop from Jeep vehicles. (Op., Doc. 53, #1348).

In 2016, wishing to bring a product embodying the '823 Patent to market, Alien Technologies engaged Lynx, and its President and founder Cullinan, to manufacture the product that Alien Technologies calls the TOPLIFT PRO. (Hall Decl., Doc. 66-21, #1881; Cullinan Decl., Doc. 70-2, #4027–28). Relevant to the pending Motion, the TOPLIFT PRO has a frame that uses two vertical support posts to bear the weight of the vehicle's hardtop. ('823 Patent, Doc. 66-4, #1739, 1743; Doc. 66-21, #1883). Lynx manufactured the TOPLIFT PRO for Alien Technologies, and Alien Technologies sold it in the United States. (Doc. 66-21 ¶ 13, #1884; Doc. 79, #4280).

On February 6, 2018, as part of the parties' ongoing business arrangements, Lynx prepared, and the parties executed, a "Confidentiality Agreement." (Doc. 66-23, #1910–13 (Agreement); Doc. 77, #4199). The agreement allowed the parties to share nonpublic information with each other. And it barred the recipient of any such information from disclosing it outside the confines of their business relationship. (Doc. 66-23, #1910–13).

Some eleven months later, on December 6, 2018, the parties had a meeting that is key to the current dispute. While all agree the meeting occurred, they have differing accounts of exactly what the parties discussed. (Doc. 66-21, #1881; Doc. 70-2, #4028). According to Lynx, the meeting was limited to discussing "payment terms, quality issues, and deliveries and deposits for future production" relating to the TOPLIFT PRO. (Doc. 70-2 ¶ 8, #4028). Alien Technologies generally agrees the

parties discussed these issues, (Prelim. Inj. Hr'g Tr. Day One, Doc. 79, #4255), but more importantly, it contends that Hall also "showed … *a confidential hand-sketched drawing … of a new one-legged version of a Jeep hardtop removal tool*." (Doc. 66-21 ¶ 7, #1881 (emphasis added)). More on that in a bit.

The business relationship soured in 2019, and the parties parted ways, which left Alien Technologies with the need to find a new manufacturer for its TOPLIFT PRO product. (Doc. 66-21 ¶¶ 6, 8, #1881; Doc. 70-2 ¶¶ 7, 9, 15, #4028–29, 4036–37). But Lynx was not done—it began its own separate foray into the Jeep hardtop removal tool market. Specifically, in late 2019, Lynx began to manufacture and to sell the RollnJack Lift—a Jeep hardtop removal apparatus that is eerily similar to the design depicted in the drawing that Hall says he shared at the December 2018 meeting. (Doc. 66-21 ¶ 8, #1882; Doc. 70-2, #4059).

Believing that production and sale of the RollnJack violated its rights, Alien Technologies sued Lynx in November 2020. The complaint alleged in relevant part that the RollnJack product (1) infringes the '823 Patent, (2) constitutes proof that Lynx misappropriated a trade secret in violation of the parties' confidentiality agreement, and therefore (3) evidences a breach of that confidentiality agreement. (Compl., Doc. 1; Am. Compl., Doc. 46). After Alien Technologies brought suit, but before the case was reassigned to the undersigned, the Court held a *Markman* hearing and issued its claim construction order and opinion, (9/21/21 Min. Entry; Doc. 53), and the parties began discovery.

4

Based on financial data Lynx disclosed during discovery regarding RollnJack sales, Alien Technologies moved for a temporary restraining order and a preliminary injunction against Lynx's further advertising, sale, or distribution of the product in the United States. (Doc. 66). Lynx filed an opposition. (Doc. 70). And the Court held a two-day hearing on the motion at which the parties presented evidence and arguments in support of their positions. (8/21/23 Min. Entry; 8/22/23 Min. Entry). Following the hearing, the parties, at the request of the Court, submitted supplemental briefing regarding the issue of bond necessary to secure the entry of a preliminary injunction. (Docs. 74, 76). The matter is now ripe.

## LEGAL STANDARD

"The party seeking the preliminary injunction bears the burden of justifying such relief." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012). When reviewing motions for preliminary injunctive relief, courts assess "(1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without a preliminary injunction; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction." *Id.* "These factors are not prerequisites, but are factors that are to be balanced against each other." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). That said, failing to prove a likelihood of success is usually fatal to obtaining injunctive relief. *Gonzales v. Nat'l Bd. Of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

Whenever material facts relevant to the preliminary injunction sought are in dispute, a district court must hold an evidentiary hearing. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 553 (6th Cir. 2007). At such a hearing, the Court may make credibility determinations, *id.*; *Curtis v. Story*, 863 F.2d 47 (6th Cir. 1988) (table), and preliminary factual findings, *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir. 1997). While the movant need not proffer "irrefutable proof" or "prove his case in full at a preliminary injunction hearing" to merit his requested relief, *In re DeLorean Motor Co.*, 755 F.2d 1223, 1230 (6th Cir. 1985) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)), the movant must furnish sufficient evidence to make "a clear showing" that the balance of factors favors the issuance of a preliminary injunction. *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). This is because a preliminary injunction is an "extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (cleaned up).

## LAW AND ANALYSIS

Alien Technologies moved for injunctive relief against Lynx on the basis of both the patent infringement and trade secrets claims. (Doc. 66-1, #1651, 1653). As to the latter, the Court finds that the likelihood of success and irreparable harm factors support Alien Technologies' requested relief. The Court further finds the balance of

equities to be largely in equipoise. Thus, the overall balance of these factors supports granting Alien Technologies preliminary injunctive relief on the trade secrets claim. And, because that will provide Alien Technologies all the relief it seeks at this time, the Court need not, and thus does not, address the patent infringement claim.

## A.     Preliminary Injunction Factors and Plaintiffs' Trade Secrets Claim

### 1.     Likelihood of Success

Begin with the likelihood of success prong.[2] "[T]o prevail on a misappropriation-of-trade-secret claim, a plaintiff must show by a preponderance of the evidence: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Handel's Enters., Inc. v. Schulenburg*, 765 F. App'x 117, 122 (6th Cir. 2019) (citation omitted). Plaintiffs have made a clear showing as to each of these elements such that the Court finds that Plaintiffs are likely to succeed on their trade secrets claim at trial.

To establish the existence of a trade secret, courts review a variety of non-dispositive factors including "[t]he extent to which the information is known" both inside and outside the business, the efforts taken "to guard the secrecy of the information," the economic value of the information, and "the amount of time and

---

[2] Alien alleges two trade secret claims in its complaint—one federal and one state. (Doc. 46, #1134–37 (raising claims under the federal Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, et seq., and under the Ohio Uniform Trade Secrets Act, O.R.C. § 1333.61, et seq.)). Both claims involve substantially the same inquiry. *Mesa Indus, Inc. v. Charter Indus. Supply, Inc.*, No. 1:22-cv-160, 2022 WL 1044720, at *6 (S.D. Ohio Apr. 7, 2020) (collecting cases holding that misappropriation of trade secrets claims are similar under both federal and Ohio law).

expense it would take for others to acquire and [to] duplicate the information." *Mesa*, 2022 WL 1044720, at *5 (citation omitted). As to the existence of a trade secret, Alien Technologies through Hall has shown by clear and convincing evidence that the one-legged removal tool Hall sketched constitutes a trade secret. Hall declared that the design had economic value and was not known to others, even to Alien Technologies' employees, at the time he drew it and showed it to Cullinan. (Doc. 66-21, #1882; Doc. 79, #4255, 4267, 4270 (Hall's testimony that the original sketches of the one-legged design were secret and that he disclosed the design only to Cullinan in December 2018)). The potential economic benefit Alien Technologies could reap from Hall's one-legged design is confirmed by the rapid growth in Lynx's sales of its RollnJack product, which has a markedly similar structure to Hall's sketch of the proposed product. (McElroy Decl., Doc. 66-27, #1930–32; Doc. 66-21 ¶¶ 8–10, #1881–82; Doc. 79, #4380 (Defendants did not present a rebuttal expert to challenge Plaintiffs' expert's report on Lynx's sales data)). In addition, Hall testified that he disclosed this information to Cullinan at the December 2018 meeting, (Doc. 79, #4255), a meeting that was subject to the parties' confidentiality agreement, (Doc. 66-23, #1910). And that agreement covers "information … not generally known to the public relating to … drawings, … [and] designs" of potential products. (Doc. 66-21 ¶ 7, #1881; Doc. 66-23, #1910).

Moreover, this is not a design that could easily be produced without design tweaks and testing to ensure that the mechanics of the apparatus worked effectively. (Doc. 79, #4271–74 (Hall's testimony that it would take at least six months to produce

a prototype of the new product); *id.* at #4258 (Hall's testimony that it "took four and a half years to come up with my design before applying it to market"); *id.* at #4266, 4270 (same)). After all, the one-leg design must have a base that fits under the wheels of the Jeep, but at the same time, it must be long and wide enough to ensure the device's center of gravity, even when carrying a vehicle hardtop, remains supported to avoid having the apparatus topple. (Corrected Glancey Decl., Doc. 71-1, #4102–04; Doc. 79, #4271). This is no easy mechanical task. (Doc. 79, #4370–71 (Dr. Glancey's testimony about the need for the structure to have multiple points where the vehicle's top is supported, which points cover "a large enough area to provide the ability to lift and the ability to secure the top" from sliding off or tipping the device)).

Taking these details together, Alien Technologies has preliminarily proven by clear and convincing evidence that Hall's sketch constitutes a trade secret. That is to say, given the evidence that Hall's design was closely guarded for several years, protected by a confidentiality agreement, possessed economic value as a novel way to remove the top of a Jeep, and required some skill and expertise to conceive of and to reduce to practice in the form of a marketable product, Plaintiffs "ha[ve] at least shown a substantial likelihood that the [sketch] … qualif[ies]" as a trade secret. *Mesa*, 2022 WL 1044720, at *5.

Next, the testimony adduced at the preliminary injunction hearing supports a finding that Defendants obtained the design through a confidential business relationship—the disputed business meeting between Hall and Cullinan. (Doc. 79, #4255–57). Hall, through his declaration and hearing testimony, testified in detail

9

about what transpired at the fateful December 6, 2018, meeting. (*Id.*; Doc. 66-21 ¶¶ 7–8, #1881–82). Hall credibly testified about the matters discussed, when the parties arrived at the meeting, where the parties sat, when certain issues were raised, and who engaged primarily on quality control versus licensing and product design issues. (Doc. 79, #4256, 4279–80). Essentially, Hall's testimony painted a complete picture of how the meeting transpired, which matched details and notes Hall testified he jotted down during the meeting itself.[3] (Hall Sketch, Doc. 66-24, #1915–17). These details—including Hall's assertion that he showed Cullinan a sketch purporting to depict a one-leg removal tool and that they discussed that drawing at length—were corroborated by the testimony of Gary Watchorn, an employee of Lynx at the time who attended the meeting.[4] (Doc. 79, #4414–22). Hall also testified that at this December 2018 meeting, he not only showed Cullinan the design sketch, but also provided him with a Xerox copy of the sketch to retain for use in the production process. (*Id.* at #4271–72, 4284–86). Because Hall's account is corroborated by and consistent with other evidence admitted in the record regarding the December 6, 2018, meeting, the Court finds it credible and gives it significant probative weight. *Cf. Dearborn Mid-West Co. v. F M Sylvan, Inc.*, No. 22-cv-12114, 2022 WL 16716217,

---

[3] For example, Hall testified that the added detail related to the caster wheels in the first sketch of his proposed one-leg removal device as compared to the second sketch was because he wanted to highlight the feature Cullinan purportedly proposed (that "a hand crank" be used to create vertical lift) in the second image. (Doc. 66-24, #1915, 1917; Doc. 79, #4281–83).

[4] And the March 25, 2021, email from Watchorn that memorialized the details from the December 2018 meeting—an email Watchorn credibly testified properly recorded what occurred during that meeting even though it was written approximately two years after the initial version of his minutes (Doc. 79, #4422–23, 4429–36, 4444–45, 4446–48)—confirm Hall's testimony about the timeline and what happened during his interactions with Cullinan on December 6, 2018. (*Id.* at #4446 (admitting Plaintiff's Exhibit 7 into evidence)).

at *7–8 (E.D. Mich. Nov. 4, 2022) (crediting testimony of plaintiffs' witnesses who provided a credible and thorough account of how defendants' employees likely accessed and appropriated trade secrets information from plaintiffs' computer systems). And as a result, this credible testimony satisfies Plaintiffs' preliminary burden to show by clear and convincing evidence that Defendants accessed Plaintiffs' trade secret via a confidential business relationship, *Mesa*, 2022 WL 1044720, at *5 ("Where an express agreement bars disclosure of trade secrets, the defendant acquires trade secrets[, like confidential design drawings,] through a confidential relationship.").

Finally, Alien Technologies made a clear preliminary showing that Lynx misused Alien Technologies' trade secret in violation of their confidentiality agreement. It is undeniable that Hall's sketch of a proposed one-legged device looks nearly identical to the RollnJack product Lynx actually produced. (Doc. 66-21 ¶ 8, #1882). Not only are the designs markedly similar, so are the measurements. At the evidentiary hearing, Defendants presented a physical exemplar of the RollnJack product, and the Court conducted several measurements of this physical product for the record without objection from either party (or a request from either to confirm the dimensions identified by the Court). (Doc. 66-24, #1915; Prelim. Inj. Hr'g Tr. Day Two, Doc. 80, #4512–13, 4632). The measurements written on Hall's sketch, which Alien Technologies says was shown and given to Cullinan on December 6, 2018, and those

11

the Court measured on the exemplar were identical in many respects[5] and differed by only inches as to others.[6] (Doc. 66-24, #1915; Doc. 80, #4512–13, 4632). Moreover, Cullinan has no personal engineering or mechanical experience and was not known to have designed any product he manufactured or sold through Lynx before the RollnJack.[7] (Doc. 70-2, #4027 (Bachelor of Arts degree in "marketing and management"); Doc. 79, #4438–42; Doc. 80, #4474–77 (Cullinan's testimony that the first sketch of a removal device he made was for the RollnJack in 2019—the first product of its kind that he produced on his own for Lynx)). That combination persuades the Court that the material similarity between the design of the RollnJack device and Hall's sketch in both shape and size supports an inference that Lynx's only basis for producing the RollnJack was through its misappropriation of the sketch Hall provided at the December 6, 2018, meeting. *Dearborn*, 2022 WL 16716217, at *11 ("The court finds particularly persuasive the evidence presented regarding the identical nature of Sylvan's safety decline device when compared to DMW's device, as well as the identical welding plan notes within the companies' respective standards. Plaintiffs provided credible testimony that, based on Sylvan's prior

---

[5] The length between the wheels on the caster base in the drawing and on the exemplar were both 36 inches. And the length of the top support structure was 48 inches in both places.

[6] The longest gap between the padded bumpers was 29 inches on the physical exemplar as compared to 30 inches on the sketch. And the length of the primary support beam for the base was 40 inches on the physical exemplar as compared to 44 inches in the sketch.

[7] In fact, Cullinan could not persuasively answer the Court's questioning why he chose to produce his own hardtop removal device for the first time in 2019 other than to make vague references to his experience in "contract manufacturing" and to rely heavily on his production of Plaintiffs' TOPLIFT PRO (Doc. 80, #4492–94)—both details that further support Plaintiffs' narrative that Cullinan's production of the RollnJack was born out of his access to Hall's sketch of the proposed one-legged hardtop removal apparatus.

position in the industry as being primarily a pipe installer, it would have been impossible for Sylvan to develop functioning conveyor systems ... within [the relevant project's] deadlines.").

Lynx disputes each prong of Alien Technologies' trade secrets claim. Lynx contends that Hall's sketch cannot constitute a trade secret because it was disclosed in Hall's '823 Patent. (Doc. 70, #3637). It further argues that there is no evidence the sketch was shared in the December 2018 meeting. (*Id.*). And finally, it claims that Alien Technologies has presented no evidence of Lynx's purported misuse of the sketch. (*Id.* at #3637–38). But none of these arguments survives further scrutiny.

Start with Lynx's contention regarding the '823 Patent. Yes, "information in the public domain by way of a patent can no longer be a trade secret." *Hickory Specialties, Inc. v. Forest Flavors Int'l, Inc.*, 215 F.3d 1326, at *6 (6th Cir. 2000) (table). And yes, the '823 Patent references a "vertical support structure comprise[d of] a *single, or a plurality* of vertical beams." (Doc. 66-4, #1752). But Defendants misunderstand what trade secret is at issue here. The trade secret is not the fact that the RollnJack removal device has one vertical support beam. Rather, the trade secret encompasses the shape, size, and contours of the entire apparatus's frame and structure that makes such a removal device functional and capable of supporting a vehicle top without tipping. (Doc. 71-1, #4102–04; Doc. 79, #4244–45; *id.* at #4271; *id.* at #4370–71). As no pictures of such a one-legged removal device were included in the '823 Patent, (Doc. 66-4), the overall appearance of the structure and arrangement of the frame for a proposed one-legged removal device were not public. Rather, the

13

particular arrangement and dimensions were in fact secret details protected from disclosure by the parties' confidentiality agreement—that is to say, trade secrets.[8] (Doc. 79, #4265–66).

Lynx next contends "the evidence shows that Mr. Hall did not disclose the One Leg Removal Tool design to Mr. Cullinan during the December 6, 2018 meeting." (Doc. 70, #3637). But the Court can make credibility determinations with respect to the competing narratives presented by the parties based on the testimony adduced at the evidentiary hearing. *Certified Restoration*, 511 F.3d at 553. And as noted above, the Court finds Hall's thorough testimony about the December 2018 meeting—which was consistent with and corroborated by Watchorn's testimony—to be more credible

---

[8] The Court acknowledges that the appearance and size of a product is an unusual aspect of the article to serve as the basis for a trade secrets claim. Unlike other trade secrets, such as customer databases, industry pricing research, internal operational processes, or the like, a product's appearance and design does not retain economic value by remaining a secret for a long period of time. Eventually, to reap the benefit of the design, the company will want to expose the product to the public by selling it. And once the product hits the market, its appearance and structure become publicly available, which means it can be easily reverse engineered by a competitor who wishes to sell a knock off. (Doc. 79, #4242). To ensure the shape and design of a product cannot be reproduced, the company will need to seek additional intellectual property protection, usually in the form of a patent, if it can. *Cf. TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001) ("[Extending] protection [only to a product's design and structure] must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying."). But importantly, that does not mean the company lacks any interest in keeping the appearance and size of a product temporarily secret: there are "first-mover advantages" an innovator reaps by being the first to conceive of a particular design. *Cf. Bilski v. Kappos*, 561 U.S. 593, 651 & n.51 (2010) (Breyer, J., concurring in judgment) (citing, *inter alia*, Burk & Lemley, *Policy Levers in Patent Law*, 89 Va. L. Rev. 1575, 1618 (2003)). And this can pay dividends when the appearance or design aspects of a product help guarantee it is effective and operational, as is the case here in figuring out the mechanics of a vehicle hardtop removal device with one vertical support beam that will not tip. Burk & Lemley, *Policy Levers in Patent Law*, 89 Va. L. Rev. at 1585 n.25 ("Innovators who are first to market often enjoy substantial advantages over later imitators even when access is not physically, electronically, or legally restricted. This first mover advantage … results from practical limitations on access and delays associated with incomplete knowledge.").

14

than the testimony Cullinan provided. Cullinan lacks a technical background, had never been known to design the products he manufactured, and provided the Court with very little detail about what happened during the meeting itself. (Doc. 70-2, #4027; Doc. 79, #4438–42; Doc. 80, #4474–81). Nor did the Court find his testimony regarding how he conceived of the design credible. According to Cullinan, it came from work he had done on single-stack weight-lifting machines. (Doc. 80, #4495). But he provided no meaningful detail on that. Nor did he describe any experiments or investigation he allegedly had undertaken to determine the appropriate dimensions for the design. That was despite him admitting that he had never owned a Jeep nor worked on rooftop removal tools beyond his work with Alien Technologies. (*Id.* at #4457, 4492–94). And while Cullinan introduced deposition testimony from Barbara Avery and Barry Avery (Hall's sister and brother-in-law respectively), which perhaps could be read as supporting Cullinan's story that Hall's picture was an illustration created *after* Hall had seen Lynx's new one-leg removal tool, neither witness testified nor was subject to cross-examination at the evidentiary hearing, which would have enabled the Court to assess their respective credibilities.[9] (Doc. 80, #4486 (citing Barry Avery Dep. Tr., Doc. 70-3)).

---

[9] And neither witness provided deposition testimony that clearly supports Cullinan's story that Hall neither sketched nor shared the one-legged product design at the December 2018 meeting. Barry Avery testified only that he had not seen Hall's sketch—not that the sketch was never produced. (Barry Avery Dep. Tr., Doc. 70-3, #4073–74). And Barbara Avery testified that she observed Hall sketch *a different removal tool* called the Venture Pro in 2020. (Barbara Avery Dep. Tr., Doc. 70-3, #4082–83). That is not the one-legged design at issue here. Yet, when the parties provided, at the Court's request, the complete deposition transcripts for the Averys after the hearing, it became clear Barbara Avery's testimony relates to that other design because she proceeded to explain in her deposition that in late

Quite simply, considering the evidenced adduced at the hearing and received into evidence, the Court is persuaded that Alien Technologies has made a clear showing that Plaintiffs are likely to succeed at trial in proving Hall's version of what took place at the December 6, 2018, meeting. While subsequent developments in the record may result in a different determination than the Court reaches today, Alien Technologies has satisfied its evidentiary burden for the instant motion for preliminary injunctive relief based on the Court's inferences and factual findings taken from the evidentiary record developed at the hearing. *Camenisch*, 451 U.S. at 395 ("[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.").

Finally, Lynx asserts that "the undisputed facts demonstrate that Plaintiffs have no evidence to support their contention that Lynx misappropriated" Hall's sketch—but they provide no citation to such undisputed facts. (Doc. 70, #3637–38). Put to the side that Lynx's failure to identify such facts fails to meet its burden of production required to rebut Plaintiffs' evidentiary showing discussed above. Regardless, the Court finds the misappropriation element is clearly shown by inferring misappropriation "from evidence of access and similarity." *Stratienko v.*

---

2020 or early 2021, Alien Technologies marketed the product she had observed Hall sketching. (Barbara Avery Dep. Tr. pp. 30–34). True, Mrs. Avery suggested during her deposition that the design from Hall's December 2018 sketch looked similar to (but not the same as) the Venture Pro sketch she saw in 2020 when she viewed the drawing. (*Id.* at p. 39). But she also admitted that she had not studied Hall's 2020 drawing of the Venture Pro in any detail and that Hall told her that he was trying to recreate prior sketches that he has lost. (*Id.* at p. 31). Their deposition testimonies do not conflict with Hall's description of the December 2018 meeting. Nor do they cast doubt on the Court's assessment of Hall's greater credibility at the hearing as compared to Cullinan.

*Cordis Corp.*, 429 F.3d 592, 600 (6th Cir. 2005). As noted above, the Court credits Hall's description of Cullinan's access to his drawing during and after the December 6, 2018, meeting. And a clear comparison of the sketch to an image of the RollnJack device—in addition to a comparison of their sizes—demonstrates striking similarity between the two such that it is clear Lynx's product is produced from the sketch in violation of the parties' confidentiality agreement, (Doc. 66-21 ¶ 8, #1882). *Cf. Parker v. Winwood*, 938 F.3d 833, 836 (6th Cir. 2019) (noting in copyright law, that copying can be proven by evidence that the infringing work is strikingly similar to the copyrighted work even without evidence proving the infringer had access to the copyrighted work). The evidence strongly suggests misappropriation occurred here.

Simply put, Plaintiffs have made a clear showing at this preliminary stage that they are likely to succeed on their trade secrets claim.

### 2. Irreparable Harm

Alien Technologies has also shown irreparable harm. That is to say, it has proven that the appropriation of these trade secret "cannot be fully compensated by monetary damages." *Mesa*, 2022 WL 1044720, at *7 (citing *Overstreet*, 305 F.3d at 578). Loss of market share in a niche, quasi-monopolistic market is the kind of injury that is understood to be irreparable. *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279–80 (6th Cir. 2015); *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1170 (Fed. Cir. 2014). Both sides acknowledge that Alien Technologies and Lynx are direct competitors in the Jeep hardtop removal market. (Cullinan Dep. Tr., Doc. 66-34, #2585). And they both acknowledge that of the six other freestanding

17

hardtop removal products (none of which have a single vertical support beam) that the evidence shows are currently being sold,[10] (Doc. 70-2, #4029–32), several products are duplicates made by the same manufacturer—suggesting that there are, at most, three other competitors in the market. (Doc. 79, #4287–92; Doc. 80, #4474). Alien Technologies also adduced evidence that it had sent a cease-and-desist letter to at least one of those manufacturers and that several products post-dated the initiation of this lawsuit reflecting recent entry into the market. (Doc. 79, #4289, 4291–92).

This evidence constitutes a clear showing of a niche market, largely involving competition solely between Alien Technologies and Lynx, where sales are effective substitutes for market share and lost customers, (Doc. 80, #4624–26 (Plaintiffs' economic expert's testimony that given the "extremely similar[]" marketing techniques of Alien Technologies and Lynx and the fact that the products would be "similar both in price and in feature," customers are "far more likely" to choose either an Alien Technologies or Lynx product than to buy a different product being marketed with differing "features")). *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1151 (Fed. Cir. 2011) (holding that even in "the absence of a two-player market," it is viable to claim irreparable harm based on the loss of market share because otherwise there would be a "perverse[] … [incentive where a] subsequent adjudged [competitor] could

---

[10] In particular, the Court finds persuasive Hall's testimony that the relevant products should exclude hardtop removal devices that utilize pulley or hoist systems given the mechanics are materially different from those that are freestanding—hoist systems require a fixed structure to which the hoist is mounted. (Doc. 79, #4293). As one witness astutely noted, Hall's "perspective on … what is and is not differentiated" carries weight as "someone who works in the space every day," (Doc. 80, #4620). *Trebro*, 748 F.3d at 1170 (crediting testimony of the president of a patentee about the size of the relevant market).

point to the market presence of the first [competitor] [and successfully] oppos[e] a request for an injunction"). And given Lynx has experienced a rapid growth in the sales of the RollnJack, (Doc. 66-1, #1645; Doc. 66-27, #1930–34; Doc. 79, #4399 (Plaintiffs' economic expert's testimony about the estimated compound annual growth rate in RollnJack sales of 90.3%)), Plaintiffs have, as a result, made a sufficiently clear showing at this stage of the litigation that, in the context of this niche market, they have likely suffered a loss of customers and market share due to Lynx's misappropriation of a trade secret to design the RollnJack—a product Lynx has no right to produce and sell on its own. *RECO Equip., Inc. v. Wilson*, No. 20-4312, 2021 WL 5013816, at \*5 (6th Cir. Oct. 28, 2021) (upholding a finding of irreparable harm stemming from the loss of a "competitive advantage" resulting from the theft of trade secrets because the theft enabled the competitor to "speed up their own process and steal customers"); *Trebro*, 748 F.3d at 1170.

Separately, even if money damages were an adequate substitute, Alien Technologies also adduced evidence tending to show that it would have difficulty collecting any judgment against Defendants it might obtain. *NBBJ E. Ltd. P'ship v. NBBJ Training Acad., Inc.*, 201 F. Supp. 2d 800, 808 (S.D. Ohio 2001) ("[M]oney damages are only adequate if they can be reasonably computed *and collected.*" (quoting *CompuServe Inc. v. Cyber Promotions*, 962 F. Supp. 1015, 1027–28 (S.D. Ohio 1997) (emphasis added))). Defendants readily admit that they are at risk of bankruptcy should they lose this lawsuit. (Doc. 80, #4490). And while not dispositive on the collection issue, Plaintiffs also proffered evidence that Cullinan lives and

19

works abroad, that Lynx's primary business operations are overseas, and that while Lynx's inventory and some of its assets are in the United States, the money it obtained from manufacturing contracts with Alien Technologies previously had been sent directly to an independent corporate entity—a completely foreign entity to which Lynx lacks immediate access. (Cullinan Dep. Tr., Doc. 66-33, #2559–60, 2566–70; Doc. 80, #4491–92).[11] This evidence bolsters the Court's conclusion that collection would be difficult if not impossible, which in turn supports the notion that the harm Alien Technologies would suffer during the pendency of this litigation is properly deemed irreparable. *Salita Promotions Corp. v. Ergashev*, 500 F. Supp. 3d 648, 654–55 (E.D. Mich. 2020) (finding irreparable harm when the defendant lived abroad, likely had limited assets in the United States, and was not well-positioned financially to handle a large monetary award of damages entered against him).

Lynx disputes this by arguing that Alien Technologies failed to present evidence to show loss of market share, that the value of lost sales is compensable via a damages award, and that the delay for moving for preliminary injunctive relief evidences a lack of irreparable harm. (Doc. 70, #3639–42). But, as noted above, Defendants acknowledged that the other 'competing' products it proffered are largely made by the same manufacturers (who happen to be late entrants into the market). (Doc. 80, #4474). And Defendants failed to provide a credible rebuttal to Plaintiffs' evidence that a consumer choosing a hardtop removal device would be looking at the

---

[11] Cullinan testified at the hearing that "Cullinan International Group doesn't exist." (Doc. 80, #4492). This contradicts his own deposition testimony in which he proffered "Cullinan International Group" as the name of a "Chinese entity owned by Lynx." (Doc. 66-33, #2566).

20

materially similar products offered by Alien Technologies and Lynx rather than another product sold on the market. (Doc. 80, #4624–26). This evidence provides a clear showing that sales to Lynx constitute both lost sales and lost customers to Alien Technologies, which directly translates to lost market share in this small, monopolistic market. *Trebro*, 748 F.3d at 1170. This is especially the case given the Court found that there is a strong likelihood Lynx created the RollnJack, its only product in this market, only because of Cullinan's access and misappropriation of the design Hall sketched in December 2018. *Id.* And contrary to Defendants' contention, it is well-established in Sixth Circuit law that the theft of a trade secret that enables a competitor to edge into a market and to seize Plaintiffs' "competitive advantage"— even if such advantage is measured in part by lost sales—is an irreparable injury.[12] *RECO*, 2021 WL 5013816, at *4–5 (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)).

Finally, the Court does not find, as Lynx contends, that Alien Technologies unreasonably delayed filing its motion or that the delay here is evidence of a lack of

---

[12] And the loss of the competitive advantage by not being the first company to use Hall's sketch to design a one-legged product explains why Plaintiffs' failure to redact the sketch or images of the RollnJack in their unsealed filings in this lawsuit does not weigh against finding that Plaintiffs will suffer irreparable harm absent preliminary injunctive relief. (Doc. 67-21 ¶ 8, #2869; Doc. 67-24). Yes, the public exposure of the design and sketch undermines the value of it as a trade secret and makes knock offs by competitors easier to produce. *See supra* note 8. But this does not change the fact that, as the Court found above based on the evidence adduced at the hearing, the only way *Defendants* learned of the design was via Hall's disclosure under the confidentiality agreement. And thus, as to Lynx and Cullinan, the later public disclosure of the sketch in this lawsuit brought against them to vindicate Plaintiffs' trade secrets rights does not overcome the improper manner in which Defendants misappropriated the sketch to gain a competitive advantage over Alien Technologies by bringing the Hall's design to market first. Put another way, the design is public only because Defendants improperly handled and misappropriated Plaintiffs' trade secret.

irreparable harm. Plaintiffs did not obtain specific details about the scope of Defendants' sales (and thus their related market power) until the second half of June 2023, (Shah Decl., Doc. 66-32 ¶ 7, #2554; Def. Lynx's Suppl. Resp. Pl. Alien Tech.'s Interrogs. 4–6, Doc. 66-39)—a timeline Lynx does not meaningfully dispute, (Doc. 70-2, #4036–37 (citing the general sales range that Amazon began to display starting in March 2023)). Alien Technologies' delay until it had strong evidence of the expansive scope of the benefits Lynx reaped from the likely misappropriation of the trade secrets here is hardly unreasonable under the caselaw and does not weigh against a finding that Plaintiffs' loss of market share is an irreparable harm. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 682–83 (2014) (holding that a party does not lose the right to injunctive relief even when it waited to see whether the costs of an alleged copyright infringement "eventually gr[e]w in magnitude"); *Grand Lodge, Fraternal Ord. of Police v. Labor Council Mich. Fraternal Ord. of Police, Inc.*, 38 F.3d 1215, 1994 WL 589569, at *3 (6th Cir. 1994) (table) (finding a two- to three-year delay in seeking injunctive relief did not weigh against a finding of irreparable harm in light of the "continuing harm to [the plaintiff's] … reputation").

Thus, the Court finds that Plaintiffs have made a clear showing that they will suffer irreparable harm absent preliminary injunctive relief.

### 3. Balance of Harms and Public Interest

Finally, the remaining factors do not weigh strongly for or against issuing a preliminary injunction here. Doing so will directly harm Lynx, who has made it clear that it will suffer significant financial losses if the Court bars it from selling the

RollnJack. (Doc. 80, #4500–02 (discussing Doc. 70-2 ¶ 17, #4038)). And enjoining the sale of the RollnJack will necessarily remove the product from the U.S. market, which in turn will prevent consumers from purchasing it.[13] But this market is not expansive: the tool helps remove the hardtop off a specific brand of motor vehicle—not a universally needed or demanded product. (Doc. 79, #4303–04 (Hall's testimony that even among Jeep owners, many might not need the removal device because their Jeeps have soft tops)). Besides, even if the unavailability of a particular product causes some harm to the general public, that harm is offset by the fact that protecting trade secrets and preventing misappropriation promotes innovation thereby benefitting the public and serves the public's interest in ensuring that parties adhere to their contractual obligations and avoid unfair competition. *PUI Audio, Inc. v. Van Den Broek*, No. 3:21-cv-284, 2021 WL 5164935, at *10 (S.D. Ohio Nov. 4, 2021). On balance, the Court finds that these competing interests both for and against the issuance of injunctive relief offset each other.

**\* \* \***

Putting this together, Plaintiffs have shown that they are entitled to preliminary injunctive relief. At the evidentiary hearing, they made a clear showing that they are likely to succeed on their trade secrets claim and will suffer irreparable harm absent the issuance of an injunction. And because the balance of equities is

---

[13] Plaintiffs admitted selling a hardtop removal tool with a single vertical support beam starting in 2021 or 2022 called the Venture Pro. *See supra* note 9; (Barbara Avery Dep. Tr. p. 34). But they still contend that the Venture pro "does not look the same as th[e December 2018] drawing … and [has] a lot of other features." (Doc. 79, #4241–44). Nonetheless, this suggests there may be a substitute product available to consumers who might otherwise have purchased the RollnJack, even if the RollnJack product is no longer on the market.

essentially at equipoise, they do not weigh against granting injunctive relief. As a result, the Court finds that Plaintiffs have carried their burden of proving that they are entitled to preliminary injunctive relief on their trade secrets claim. So it **GRANTS IN PART** their Emergency Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 66).[14]

## B.    Bond

Because the Court finds that preliminary injunctive relief is merited, the Court now turns to the issue of a bond. Under Federal Rule of Civil Procedure 65(c), the Court "may issue a preliminary injunction … only if the movant gives security in an amount that the [C]ourt considers proper to pay the costs and damages sustained by any party who is found to have been wrongfully enjoined." Despite the mandatory language in the Rule, the Sixth Circuit has nonetheless held that "district court[s] possess[] discretion over *whether* to require the posting of security." *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013) (quoting *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995)). While this is perhaps a strained reading of the text, declining to require a bond makes particular sense when the parties themselves have stipulated that no bond is necessary or have expressly waived the need for such security—after all, a

---

[14] The Court declines to address the parties' arguments related to Plaintiffs' patent claim: Plaintiffs merit preliminary injunctive relief on their trade secrets claim, and they did not request a different form of equitable relief for their patent claim. (Doc. 66; Doc. 67-1, #1657). In addition, because the Court grants Plaintiffs preliminary injunctive relief, their request for a temporary restraining order is moot. So the Court **DENIES AS MOOT** Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 66) to the extent that they request a temporary restraining order.

court generally does not ignore a party's contractual relinquishment of its own rights. *Bannister v. Knox Cnty. Bd. of Ed.*, 49 F.4th 1000, 1011 (6th Cir. 2022). So, however one should read Rule 65, it is unsurprising that courts in this circuit have enforced contractual waivers of injunction bonds. *Ray Ins. Agency, Inc. v. Wolfe*, No. 2:19-cv-2766, 2019 WL 13198202, at *3 (S.D. Ohio July 3, 2019); *Relo Franchise Serv., Inc. v. Gilman*, No. 1:18-cv-578, 2019 WL 324215, at *5 (S.D. Ohio Jan. 25, 2019); *Marlite, Inc. v. Canas*, No. 5:09-cv-1401, 2009 WL 7272686, at *12 (N.D. Ohio July 22, 2009).

This caselaw applies here because the non-disclosure agreement serving as the basis for the Court's decision to enjoin Defendants' sale of the RollnJack contains such a waiver. Under section 9 of the agreement, should one of the parties breach the agreement by sharing confidential information it has received, "the [party who originally provided the information under the contract] will be entitled to *injunctive relief* for the receiving party's breach of any of its obligations thereunder without proof of actual damages and *without the posting of bond or other security*." (Doc. 66-23, #1912 (emphasis added)). As noted above, the Court finds that Alien Technologies has made a clear showing that it is likely to succeed on the trade secrets claim. The evidence strongly suggests that Lynx used confidential information to develop and then to market the RollnJack, thereby distributing that information to the public. As such, under the agreement, Alien Technologies, as "the disclosing party" (i.e., the party who shared the confidential information about the shape, size, and design of the one-legged removal tool), is "entitled to injunctive relief for the receiving part[ies'

25

(Defendants')] breach of … [their confidentiality] obligations … without the posting of bond or other security."[15] (*Id.*).

Accordingly, the Court finds that Plaintiffs are entitled to the preliminary injunction without the need to post a bond.

## CONCLUSION

Because the evidence produced at the hearing strongly suggests that Hall and Cullinan met to discuss Hall's idea for a hardtop removal device with a single support beam at the fateful December 6, 2018, meeting, and that Lynx then produced a nearly identical removal tool without Alien Technologies' permission, Plaintiffs have shown that they merit preliminary injunctive relief on their trade secrets claim. And based on that claim, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs'

---

[15] Admittedly, one could argue that this provision is imperfectly drafted. The provision entitled Plaintiffs to "injunctive relief" rather than to *preliminary* injunctive relief "without the posting of bond or other security." (Doc. 66-23, #1912). But as has long been the practice in equity, a bond is issued for securing only *temporary* or *preliminary* injunctive relief. *Houghton v. Cortelyou*, 208 U.S. 149, 157 (1908) (explaining that once the court granted a "permanent injunction[,] … [that] decree necessarily superseded the restraining order[ such that] … there was no further liability on the bond, [which was] given only to secure th[e] [restraining] order"); *Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512, 516 (7th Cir. 2002) ("The purpose of an injunction bond is to compensate the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him, and so it is required only for a temporary restraining order or a preliminary injunction, Fed. R. Civ. P. 65(c), not for a permanent injunction."); *accord St. Louis, Iron Mountain & S. Ry. Co. v. McKnight*, 244 U.S. 368, 374 (1917) (noting that "[d]amages arising between … the date of the decree granting the *permanent* injunction [and] … the date of the decree [dissolving the permanent injunction] … were not recoverable on the injunction bond," which was released upon the issuance of the permanent injunction). As a result, the only way in which to read this provision is to conclude that it refers to Defendants' express waiver of the need for Plaintiffs to post a bond to secure *preliminary* injunctive relief. And to the extent that any ambiguity subsists, the doctrine of *contra proferentem* requires that any ambiguity be construed against Defendants, who drafted the agreement (Doc. 66-23, #1912, Doc. 78-1, #4199). *Greenwood, Inc. v. IES Com., Inc.*, No. 22-1795, 2023 WL 2758347, at *1 (4th Cir. Apr. 3, 2023) (quoting *S. Atl. Fin. Serv., Inc. v. Middleton*, 590 S.E.2d 27, 29 (S.C. 2003)).

Emergency Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 66). Specifically, the Court **PRELIMINARILY ENJOINS** Defendants from directly or indirectly advertising, manufacturing, selling, or distributing its RollnJack product within the United States. Moreover, the Court does so without requiring Plaintiffs to post a bond. Finally, based on its decision on the preliminary injunction, the Court **DENIES AS MOOT** Plaintiffs' request for a temporary restraining order.

Separately, because this Opinion references documents that the parties filed under seal, the Court **ORDERS** that this Opinion shall be **TEMPORARILY SEALED** on the Court's docket. The Court **ORDERS** that, **on or before October 9, 2023**, the parties shall each file a brief on the sealed docket identifying which portions of this Opinion, if any, warrant a permanent seal under the standards set forth in *Shane Group, Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299 (6th Cir. 2016), and its progeny, and explaining why that is so.

**SO ORDERED.**

September 29, 2023
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**